FILED

17 NOV 14 PM 3:30

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-29638-4 SEA

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

| | |
|---|---|
| SUSAN PEDER, for herself and as assignee of the CHAPTER 7 BANKRUPTCY ESTATE OF X10 WIRELESS TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCOTTSDALE INDEMNITY COMPANY also doing business as SCOTTSDALE INSURANCE COMPANY, an insurer authorized by the Washington insurance commissioner, and FREEDOM SPECIALTY INSURANCE COMPANY, an insurer authorized by the Washington insurance commissioner <br><br> Defendants. | No. <br><br> COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES |

Plaintiff Susan Peder ("Peder"), for herself and as assignee of the Chapter 7 Bankruptcy Estate of X10 Wireless Technology, Inc. (""X10") and as Judgment Creditor of X10, alleges the following against X10's insurer defendants Scottsdale Indemnity Company (also doing business as Scottsdale Insurance Company) and Freedom Specialty Insurance Company (collectively, "Scottsdale" unless separately identified below):

COMPLAINT - 1

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

51521900.1

## PARTIES

1.    <u>Plaintiff Peder</u>.  Plaintiff is an unmarried individual residing in King County, Washington.  Plaintiff was the plaintiff in the action captioned *Peder v. X10 USA, Inc., et al.,* King County (Washington) Superior Court Cause No. 11-2-44104-1KNT (the "Lawsuit") against X10 USA, Inc. and X10, among others.  Plaintiff is the judgment creditor and assignee of X10, and brings this action in both capacities.

2.    <u>Defendant Scottsdale Indemnity Company</u>.  Defendant Scottsdale Indemnity Company is a foreign insurer authorized by the Washington Insurance Commissioner. Scottsdale Indemnity Company issued an insurance contract insuring persons (X10) residing in King County, Washington and issued coverage correspondence to such persons.  Defendant Scottsdale Indemnity Company also issued coverage correspondence as "Scottsdale Insurance Company" with respect to the Lawsuit at issue in this action.

3.    <u>Defendant Freedom Specialty Insurance Company</u>.  Defendant Freedom Specialty Insurance Company ("FSIC") is a foreign insurer authorized by the Washington Insurance commissioner.  On information and belief FSIC handled, on behalf of Scottsdale Indemnity Company, X10's claim for coverage for the Lawsuit at issue in this action, including sending coverage correspondence to X10 at its address in King County, Washington.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to, among other things, RCW 7.24.010 and .030 because this action presents a justiciable controversy between the parties regarding Scottsdale's obligations to X10, and thus to Peder as X10's judgment creditor and assignee, under the insurance policy at issue.  This is an actual and existing dispute within the meaning of Chapter 7.24 RCW, between parties with genuine and opposing interests which are direct and substantial, a judicial determination of which will be final and conclusive.

COMPLAINT - 2

5.      This Court has personal jurisdiction over Scottsdale pursuant to, among other things, RCW 4.12.0125 and 4.28.185 because Scottsdale contracted to insure X10 which resided in King County, Washington at all relevant times, and Scottsdale, among other things, unreasonably and tortiously refused to provide coverage on behalf of X10 in the Lawsuit at issue in this action.

6.      Venue for this action properly lies in this Court pursuant to, among others, RCW 48.05.220 because Scottsdale contracted to insure X10 which has resided in King County, Washington at all relevant times, and denied X10's demand for coverage for the Lawsuit at issue in this action.

## GENERAL ALLEGATIONS

7.      X10 was the named insured under policy number EKI3036412 (the "Policy") issued by Scottsdale Indemnity Company for at least the period April 7, 2011 through April 7, 2012.

8.      A true and correct copy of the Policy is attached as Exhibit A to this complaint.

9.      Peder was married to her former spouse, Alexander Peder ("Alex Peder"), while Alex Peder was employed by X10 and its affiliate X10 USA, Inc. from 1996 until 2010.

10.     Peder and Alex Peder divorced in 2011.  In the divorce, Peder was assigned all rights and benefits of any causes of action, settlements, verdicts or judgments arising from or relating to Alex Peder's employment with X10 and X10 USA, Inc.  The assigned rights and benefits included a severance package Alex Peder was offered to induce him to remain an employee until the occurrence of certain dates or events, unpaid accrued vacation time, and a right to compensation for work performed during the nearly 18 months after he was removed from the payroll in December 2008.

11.     In December 2011, Peder commenced against X10 and X10 USA, Inc. the Lawsuit seeking to enforce the rights and benefits assigned to Peder by Alex Peder, as well as double damages and attorney fees under RCW 48.52.070.

COMPLAINT - 3

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400   FAX (206) 447-9700

51521900.1

12.     A true and correct copy of the complaint filed in the Lawsuit is attached as Exhibit B to this complaint.

13.     The Lawsuit was promptly tendered to Scottsdale.  In a January 18, 2012 letter from FSIC on Scottsdale's behalf, Scottsdale agreed to defend X10 and X10 USA, Inc. under a reservation of rights.  Scottsdale selected defense counsel for X10 and X10 USA, Inc.

14.     A true and correct copy of Scottsdale's initial reservation of rights letter is attached as Exhibit C to this complaint.

15.     In December 2012, Peder's counsel sent X10's defense counsel a statement of damages stating that Peder was seeking $516,225 in various forms of unpaid compensation/benefits, double damages in that same amount and "to be determined" attorney fees and costs (pursuant to Chapters 49.48 and 49.52 RCW, which were invoked in Peder's complaint in the Lawsuit), and "to be determined" prejudgment interest.

16.     A true and correct copy of that December 2012 letter from Peder's counsel is attached as Exhibit D to this complaint.

17.     In March 2013, the parties to the Lawsuit and Scottsdale participated in mediation.  The mediation did not result in a settlement because Scottsdale refused to acknowledge coverage responsibility (beyond the duty to defend) or contribute meaningfully toward settlement, relying upon the various coverage reservations asserted in its reservation of rights letter.

18.     In April 2013, Scottsdale's coverage counsel sent personal counsel for X10 and X10 USA, Inc. a letter reiterating Scottdale's coverage denial and the basis therefor.

19.     In June 2013, the parties to the Lawsuit participated in a second negotiating session.  X10 and X10 USA, Inc. were represented at that negotiating session by their Scottsdale-appointed defense counsel.  A Scottsdale representative was not asked to attend the negotiating session because Scottsdale had previously, in its April 2013 letter, expressly reiterated the coverage denial that had impeded the prior mediation.

COMPLAINT - 4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

51521900.1

20.     At the conclusion of that June 2013 negotiating session, Peder and X10 executed an initial settlement agreement, later confirmed by a comprehensive settlement agreement, pursuant to which Peder would release and dismiss all claims in the Lawsuit in return for Scottsdale's unequivocal written agreement to pay Peder $550,000, and payment of that amount, both by specified dates.  Those written settlement agreements expressly stated that the settlement between Peder and X10 and X10 USA, Inc. would be nullified as if never entered if Scottsdale's written funding commitment and payment were not received by the dates specified.

21.     True and correct copies of those settlement agreements are attached as Exhibit E to this complaint.

22.     In early July 2013, counsel that Scottsdale retained to defend X10 and X10 USA, Inc. in the Lawsuit sent Scottsdale a letter enclosing a copy of that written settlement agreement, stating defense counsel's opinion that that settlement was a fair and reasonable settlement within the range of potential liability outcomes in the Lawsuit, and thus stating defense counsel's hope that Scottsdale would agree to fund that settlement.  That letter also expressed defense counsel's belief that any judgment would "likely drive X10 into bankruptcy and out of business."

23.     On July 12, 2013, coverage counsel for X10 and X10 USA, Inc. sent Scottsdale a letter demanding that Scottsdale fund that $550,000 settlement and explaining why Scottsdale was obligated to do so.

24.     On July 22, 2013, Scottsdale's coverage counsel sent coverage counsel for X10 and X10 USA, Inc. a letter refusing to fund the $550,000 settlement.

25.     None of Scottsdale's correspondence to its insureds or their defense counsel questioned or challenged the reasonableness of the $550,000 settlement in the Lawsuit.

26.     Because Scottsdale refused to fund the $550,000 settlement between Peder and X10 and X10 USA, Inc. by the dates specified in the written settlement agreement, that agreement was nullified pursuant to its own terms.

COMPLAINT - 5

27.     Endorsement No. 31 to the Policy is entitled "Wage and Hour Claim Endorsement."  That endorsement provides a $250,000 maximum aggregate limit of liability under the Employment Practices Coverage Section for loss as a result of "Wage and Hour Claims" as defined by the Policy.

28.     None of Scottsdale's correspondence to X10 and/or X10 USA, Inc. concerning the Lawsuit disclosed that the Policy contained a Wage and Hour Claim Endorsement with a $250,000 aggregate limit.

29.     Shortly after the written settlement agreement was nullified, and as X10 defense counsel's letter to Scottsdale predicted would happen without a settlement of the Lawsuit, X10 filed a Chapter 7 bankruptcy petition.

30.     Peder timely filed a $1,378,768.08 claim in X10's bankruptcy.  Peder's claim was the largest claim filed in X10's bankruptcy.

31.     After the Trustee for X10's bankruptcy estate had an opportunity to review and consider Peder's bankruptcy claim, the Trustee and Peder negotiated and executed a settlement agreement pursuant to which the Trustee stipulated to entry of judgment against X10 in the amount of $550,000 (upon lifting of the automatic bankruptcy stay) and assigned to Peder all of X10's contractual and extracontractual rights and claims against Scottsdale.

32.     On February 4, 2016, the bankruptcy court approved that settlement.

33.     On January 18, 2017, bankruptcy court entered an Order granting Peder relief from stay with respect to the claims assigned to her under that settlement.

34.     On May 5, 2017, Judge Bill Bowman of the King County Superior Court entered an Order declaring that the $550,000 amount of the settlement between Peder and X10 was reasonable.

35.     On May 15, 2017, Judge John Chun entered Judgment in the principal amount of $550,000 in favor of Peder and against X10.

COMPLAINT - 6

36. On July 28, 2017, Peder's undersigned counsel sent Scottsdale a letter enclosing the Judgment and demanding that Scottsdale satisfy that Judgment by paying Peder the $550,000 principal amount. That letter also enclosed a 20-day pre-suit notice as required under Washington's Insurance Fair Conduct Act, RCW 48.30.015 ("IFCA").

37. A true and correct copy of Peder's undersigned counsel's July 28, 2017 letter to Scottsdale is attached as Exhibit F to this complaint.

38. On August 21, 2017, Scottsdale's counsel sent Peder's counsel a letter refusing to satisfy Peder's $550,000 Judgment against Scottsdale. That letter alleged, among other things, that the full amount of that Judgment represented unpaid "wages" not covered under the Policy.

39. Scottsdale's August 21, 2017 letter did not disclose that the Policy contained a "Wage and Hour Claim Endorsement" providing $250,000 in limits under the Employment Practices Coverage Section, and did not offer to pay that $250,000 in partial satisfaction of Peder's Judgment against X10.

**FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT**

40. Peder incorporates herein by reference so much of the other portions of this complaint as is not inconsistent with this first cause of action.

41. An actual and justiciable controversy has arisen and now exists between Peder and Scottsdale concerning X10's (and thus, Peder's as X10's assignee and judgment creditor) rights and Scottsdale's obligations under the Policy and applicable claims handling regulations. Specifically, Peder contends that Scottsdale was obligated to pay the full amount of the settlement reached and Judgment subsequently entered in favor of Peder and against X10. Scottsdale disputes that contention. Alternatively, Peder contends that if the settlement and Judgment amounts represent "wages" that are not covered under the Policy's main form, that settlement and Judgment are at least partly covered under the Policy's "Wage and Hour Claim Endorsement."

COMPLAINT - 7

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400   FAX (206) 447-9700

51521900.1

42.     Scottsdale has refused to pay any part of the settlement reached or Judgment subsequently entered in favor of Peder and against X10.

43.     Scottsdale failed to disclose the "Wage and Hour Claim Endorsement" in its correspondence concerning coverage for Peder's Lawsuit and Judgment against X10.

44.     Peder is entitled to a judicial determination of her rights and Scottsdale's obligations under the Policy and applicable claims handling regulations with respect to the settlement reached and Judgment subsequently entered in the Lawsuit, and specifically that:

        a.      Scottsdale is obligated to pay the full amount of the $550,000 Judgment entered against X10 in the Lawsuit;

        b.      Alternatively, if that Judgment represents "wages" that are not covered under the Policy's main form, Scottsdale is obligated to pay the $250,000 of that Judgment under the Policy's "Wage and Hour Claim Endorsement."

        c.      Scottsdale breached the Policy by refusing to fully or partially fund that settlement reached or Judgment subsequently entered.

        d.      Scottsdale violated applicable claims handling regulations by failing to disclose the "Wage and Hour Claim Endorsement" and other pertinent policy provisions in its correspondence concerning coverage for Peder's settlement with and Judgment against X10 in the Lawsuit.

45.     A determination by this Court of the parties' respective rights, duties and liabilities under the Policy and applicable claims handling regulations is necessary and proper at this time.

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT

46.     Peder incorporates herein by reference so much of the other portions of this complaint as is not inconsistent with this second cause of action.

47.     Scottsdale failed and refused to perform its obligations set forth in the Policy in that it failed and refused to pay any part of the settlement reached or Judgment subsequently

COMPLAINT - 8

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3296
PHONE (206) 447-4400   FAX (206) 447-9700

entered in the Lawsuit, and took the position that it had no coverage obligations with respect to that Lawsuit other than a duty to defend.  As such, Scottsdale breached its contractual duties under the Policy.

48.     As a direct and proximate result of Scottsdale's breach of its contractual duties, X10 and Peder have incurred substantial damages according to proof at trial, including but not limited to all or, alternatively, part of the settlement reached and Judgment subsequently entered in the Lawsuit.  Furthermore, both X10 and Peder incurred, and Peder continues to incur, fees and costs to obtain the full coverage available under the Policy.

### THIRD CAUSE OF ACTION: INSURANCE BAD FAITH

49.     Peder incorporates herein by reference so much of the other portions of this complaint as is not inconsistent with this third cause of action.

50.     Scottsdale failed to act in good faith and violated applicable claims handling regulations and laws, including but not limited to those prohibiting Scottsdale from unreasonably denying coverage and requiring disclosure of all pertinent policy provisions, in handling X10's claim for coverage for the Lawsuit.

51.     Scottsdale's violations and unreasonable coverage denial constitute bad faith under applicable insurance law.

52.     X10 was prejudiced by Scottsdale's refusal to pay all or, alternatively, part of the $550,000 Judgment entered in the Lawsuit.

53.     Scottsdale is accordingly estopped from denying having a duty to pay the Judgment entered in the Lawsuit.

54.     As a direct and proximate result of Scottsdale's bad faith, X10 and Peder have incurred substantial damages according to proof at trial, including but not limited to the amount of the Judgment entered in the Lawsuit.  Furthermore, Peder has incurred and continues to incur fees and costs to obtain the full benefits to which she (as assignee and judgment creditor of X10) is entitled under the Policy.

COMPLAINT - 9

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON  98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

51521900.1

**FOURTH CAUSE OF ACTION: INSURANCE FAIR CONDUCT ACT**

55.     Peder incorporates herein by reference so much of the other portions of this complaint as is not inconsistent with this fourth cause of action.

56.     IFCA and the statutes and regulations referenced and incorporated in IFCA impose certain obligations upon insurers, including Scottsdale.

57.     Scottsdale committed bad faith and violated IFCA, including but not limited to under RCW 48.30.010, RCW 48.30.015, and WAC 284-30-330, et seq.

58.     X10 and Peder have sustained damages as a direct and proximate result of Scottsdale's violations of IFCA.

59.     Peder is entitled to recover damages from Scottsdale for all amounts properly owed under the Policy, treble damages, and attorney fees and expenses to the full extent allowed by law – for example, under IFCA.

60.     On or about July 28, 2017, Peder sent Scottsdale and the Washington Office of the Insurance Commissioner a pre-suit 20-day notice pursuant to IFCA.

61.     More than 23 calendar days have passed since that notice was sent to Scottsdale. Scottsdale has neither withdrawn its prior coverage denial nor in any way cured its various violations set forth in that notice.

**FIFTH CAUSE OF ACTION: CONSUMER PROTECTION ACT**

62.     Peder incorporates herein by reference so much of the other portions of this complaint as is not inconsistent with this fifth cause of action.

63.     Scottsdale's issuance of insurance for and handling of insurance claims in Washington constitutes trade or commerce that impacts the public interest.

64.     Scottsdale has committed unfair and deceptive acts and practices as set forth above.

65.     Scottsdale's actions and/or inaction constitute violations of Chapter 19.86 RCW.

COMPLAINT - 10

66.     X10 and Peder have suffered damages as a direct and proximate result of Scottsdale's unfair and deceptive acts and practices.

67.     Peder is entitled to recover damages from Scottsdale for all amounts properly owed under the Policy, treble damages and attorney fees and expenses to the full extent allowed by law – for example, the Consumer Protection Act.

## PRAYER FOR RELIEF

Plaintiff Peder requests the following relief from this Court:

1.     A declaration that Scottsdale had a duty to pay the full amount of the $550,000 settlement reached and Judgment entered in the Lawsuit;

2.     Alternatively, a declaration that Scottsdale had a duty to pay $250,000 of the settlement reached and Judgment entered in the Lawsuit, under the Policy's the "Wage and Hour Claim Endorsement"

3.     A declaration that Scottsdale breached the Policy and applicable claims handling regulations by refusing to pay the settlement reached and Judgment subsequently entered in the Lawsuit;

4.     A declaration that Scottsdale acted in bad faith;

5.     A declaration that Scottsdale violated IFCA;

6.     A declaration that Scottsdale violated the Consumer Protection Act;

7.     A judgment against Scottsdale for X10's actual damages (for example, for breach of the Policy and bad faith) and treble damages (for example, for violations of IFCA and the CPA) in the amount to be established at hearing or trial;

8.     A judgment against Scottsdale for X10's and Peder's total costs and attorney fees to the full extent allowed by law (for example, pursuant to Washington's *Olympic Steamship* doctrine, IFCA, and the CPA), in the amount to be established at hearing or trial;

9.     A judgment against Scottsdale for pre-judgment and post-judgment interest on the above amounts, to the full extent allowed by law;

COMPLAINT - 11

1    10.    Permission to amend the pleadings to add additional claims verified during

2    discovery and litigation, or claims that conform to the proof offered at the time of hearing or

3    trial; and

4    11.    Such other relief as appears to this Court to be just and equitable.

5    DATED this 14th day of November, 2017.

6                                    FOSTER PEPPER PLLC

7

8        *s/Bradley W. Hoff*
         *s/Jason R. Donovan*
         Bradley W. Hoff, WSBA No 23974

9        Jason R. Donovan, WSBA No. 40994
         FOSTER PEPPER PLLC

10       1111 Third Avenue, Suite 3000
         Seattle, WA 98101

11       Phone: 206-447-4400
         Fax: 206-447-9700

12       Email: bradley.hoff@foster.com
         Email: j.donovan@foster.com

13       Attorneys for Plaintiff Susan Peder

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 12

51521900.1

EXHIBIT A

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the **Insurer**
Home Office:
One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675

## BUSINESS AND MANAGEMENT INDEMNITY POLICY DECLARATIONS

THE EMPLOYMENT PRACTICES, DIRECTORS AND OFFICERS AND COMPANY, AND FIDUCIARY COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES, UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.

TERMS THAT APPEAR IN BOLDFACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.

| Item 1. | **Parent Company & Mailing Address:** | X10 Wireless Technology, Inc. <br> 620 Naches Ave SW <br> Renton, WA  98057 | **Policy No:** | EKI3036412 |
|---|---|---|---|---|
| | | | **Agent No:** | 29406 |
| | | | **Renewal No:** | EKI3017250 |
| | | | **Agent Name & Mailing Address:** | E-Risk Services, LLC |
| | | | | Northwest Professional Center |
| | | | | 227 US Hwy 206 |
| | | | | Suite 302 |
| | | | | Flanders, NJ 07836-9174 |

Principal Address, if different from mailing address:

---

**Item 2.**  **Policy Period:** From 4/7/2011 to 4/7/2012
12:01 A.M. local time at Principal Address shown above.

---

**Item 3.**  Coverage Sections and Limit of Liability

Employment Practices Coverage Section

1. Limit of Liability:
   a. $1,000,000    aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b. $1,000,000    additional aggregate for all **Costs, Charges and Expenses**, subject to 1.c. immediately below.
   c. $2,000,000    maximum aggregate for this Coverage Section
2. Retention:
   a. $5,000    each **Employment Practices Claim**
   b. $5,000    each **Third-Party Claim**
3. **Continuity Date:**   4/7/04
4. **Third Party** Coverage: Yes  _X_    No  _____

EKI-D-1 (04/08)

X10 USA  2110

Directors and Officers and Company Coverage Section

1. Limit of Liability:
   a. $1,000,000 aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b. $1,000,000 additional aggregate for all **Loss** under Insuring Clause A.1., subject to 1.c, immediately below.
   c. $2,000,000 maximum aggregate for this Coverage Section
2. Retention:
   a. $0 _____ each **Claim** under Insuring Clause 1.
   b. $0 _____ each **Claim** under Insuring Clause 2.
   c. $0 _____ each **Claim** under Insuring Clause 3.
3. **Continuity Date:** 4/7/04

| Item 4. | Premium: |
|---|---|

**Item 5.**  **Discovery Period** options:

1. One (1) year = 100% of the premium
2. Two (2) years = 150% of the premium
3. Three (3) years = 200% of the premium

As provided in Section H. of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

**Item 6.**  **Run-Off Period:**

1. One (1) year = 125% of the premium
2. Two (2) years = 145% of the premium
3. Three (3) years = 165% of the premium
4. Four (4) years = 185% of the premium
5. Five (5) years = 205% of the premium
6. Six (6) years = 225% of the premium

As provided in Section I. of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

**Item 7.**  Forms and Endorsements Effective at Inception of **Policy:**

EKI-D-1 (04/08), EKI-1 (04/08), EKI-P-2 (04/08), EKI-P-1 (04/08), EKI-45 (04/08), EKI-782 (01/09), EKI-167 (04/08), EKI-787 (01/09), EKI-6 (04/08), EKI-7 (04/08), EKI-8 (04/08), EKI-9 (04/08), EKI-832 (05/09), EKI-810 (01/09), EKI-199 (04/08), EKI-14 (01/09), EKI-846 (11/09), EKI-784 (01/09), EKI-15 (04/08), EKI-16 (04/09), EKI-202 (04/08), EKI-17 (03/10), EKI-845 (05/09), EKI-783 (01/09), EKI-781 (01/09), EKI-775 (01/09), EKI-21 (04/08), EKI-788 (01/09), EKI-785 (01/09), EKI-165 (04/08), EKI-37 (04/08), EKI-19 (04/08), EKI-848 (05/09), EKI-786 (01/09), EKI-766 (01/09), EKI-300-WA (04/08), NOTI0164CW (1/08)

**Item 8.**  Notices to Company:

Notice of Claims to:                                      Other Notices to:

Scottsdale Indemnity Company                             Scottsdale Indemnity Company
Attention: Claims Manager                                Attention: Claims Manager
7 World Trade Center, 33rd Floor                         7 World Trade Center, 33rd Floor
250 Greenwich Street                                     250 Greenwich Street
New York, NY 10007                                       New York, NY 10007
FSReportALoss@freedomspecialtyins.com                    FSReportALoss@freedomspecialtyins.com

These Declarations, together with the **Application**, Coverage Sections, General Terms and Conditions, and any written endorsement(s) attached thereto, shall constitute the contract between the **Insured** and the **Insurer**.

X10 USA  2111

# Scottsdale Indemnity Company

Home Office:
One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                                    President

The information contained herein replaces any similar information contained elsewhere in the policy.

X10 USA  2112

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## GENERAL TERMS AND CONDITIONS

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

### A. SEVERABILITY OF GENERAL TERMS AND CONDITIONS

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

### B. DEFINITIONS

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Company** means:

   a. the **Parent Company**; and

   b. any **Subsidiary**,

   and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3. **Discovery Period** means one of the periods described in Item 5. of the Declarations which is elected and purchased pursuant to Section H. below.

4. **Domestic Partner** means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5. **Extended Period** means the **Discovery Period** or the **Run-Off Period,** if such provision is elected and purchased pursuant to Sections H. or I. respectively, below.

6. **Insurer** means the insurance company providing this insurance.

7. **Parent Company** means the entity first named in Item 1. of the Declarations.

EKI-1 (04/08)

X10 USA 2113

8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item 2. of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item 6. of the Declarations, which is elected and purchased pursuant to Section I. below.

11. **Subsidiary** means:

    a. any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

        i. was so owned on or prior to the inception date of this **Policy**; or

        ii. becomes so owned after the inception date of this **Policy**; and

    b. any joint venture entity in which the **Parent Company**, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a. above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

    a. the acquisition by any person or entity of more than fifty percent (50%) of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

    b. the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

### C. LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

### D. WARRANTY

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. in the event the **Application**, including materials submitted or required to be submitted therewith ,contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under

X10 USA  2114

this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

### E.  CANCELLATION

1.  By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2.  This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3.  If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

### F.  ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

### G.  AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

### H.  DISCOVERY PERIOD

1.  If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 5. of the Declarations of the total premium for this **Policy**, or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item 5. of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the **Discovery Periods** set forth in Item 5. of the Declarations.

2.  As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is

X10 USA  2115

received by **Insurer** within thirty (30) days after the effective date of cancellation, or, in the event of a refusal to renew, within thirty (30) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3. In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4. The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

## I. RUN-OFF COVERAGE

In the event of a **Takeover:**

1. The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item 6. of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item 6. of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item 2. of the Declarations.

2. The **Parent Company** shall have the right to elect only one of the periods designated in Item 6. of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3. If a **Run-off Period** is elected and purchased:

   a. Section E. above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

   b. Section H. above, is deleted in its entirety; and

   c. the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item 3. of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

## J. ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration shall be commenced until at least sixty (60) days after the date the

X10 USA  2116

mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1. of the Declarations as the principal address of the **Parent Company**. The **Parent Company** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.

K.  **TERRITORY**

Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

L.  **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

M.  **ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT**

Except as provided in Section J. above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

N.  **ENTIRE AGREEMENT**

By acceptance of this **Policy**, the **Insureds** agree that this **Policy** embodies all agreements existing between them and **Insurer** or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop **Insurer** from asserting any right under the terms of this **Policy** or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by **Insurer** to form part of this **Policy**.

X10 USA  2117

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the **Insurer**

**BUSINESS AND MANAGEMENT INDEMNITY POLICY**

**EMPLOYMENT PRACTICES COVERAGE SECTION**

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

### A.  INSURING CLAUSES

1.  **Employee** Insuring Clause

    **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for an **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**.

2.  **Third-Party** Insuring Clause

    In the event **Third-Party** Coverage is affirmatively designated in Item 3. of the Declarations relating to this Coverage Section, the **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Third-Party Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for a **Third-Party Wrongful Act** taking place prior to the end of the **Policy Period**.

### B.  DEFINITIONS

1.  **Claim** means any:

    a.  **Employment Practices Claim**; or

    b.  **Third-Party Claim**.

2.  **Continuity Date** means the Continuity Date set forth in Item 3. of the Declarations relating to this Coverage Section.

3.  **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4.  **Employee** means any person who was, now is or shall become:

    a.  a full-time or part-time employee of the **Company**, including voluntary, seasonal, and temporary employees;

    b.  any individual who applies for employment with the **Company**; and

    c.  any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

X10 USA  2118

5. **Employment Practices Claim** means:

    a. a written demand against an **Insured** for damages or other relief;

    b. a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

    c. a civil proceeding against an **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document; or

    d. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of an **Employee** in their capacity as such. **Employment Practices Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

6. **Employment Practices Wrongful Act** means any actual or alleged:

    a. violation of any common or statutory federal, state, or local law prohibiting related discrimination;

    b. harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

    c. abusive or hostile work environment;

    d. wrongful discharge or termination of employment, whether actual or constructive;

    e. breach of an actual or implied employment contract;

    f. wrongful deprivation of a career opportunity, wrongful failure or refusal to employ o. wrongful demotion;

    g. employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

    h. wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects employment-related discrimination or harassment;

    i. wrongful discipline;

    j. employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

    k. **Retaliation;**

    l. negligent evaluation; or

    m. negligent hiring or negligent supervision of others in connection with a. through l. above, but only if employment-related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

7. **Insured Persons** means all persons who were, now are or shall become:

    a. a director or officer of the **Company;**

    b. any **Employee;** and

X10 USA  2119

c.  the functional equivalent of a director, officer or **Employee** in the event the **Company** is incorporated or domiciled outside the United States.

8.  **Insureds** means the **Company** and any **Insured Persons**.

9.  **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

10. **Loss** means the damages, judgments, settlements, front pay and back pay, pre-judgment or post judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

a.  taxes, fines or penalties;

b.  matters uninsurable under the laws pursuant to which this **Policy** is construed;

c.  punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds, Insurer,** this **Policy** or the **Claim** giving rise to such damages;

d.  the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

e.  amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

f.  disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

g.  the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

h.  the cost of creating or reinstating employment;

i.  any amount owed as wages to any **Employee**, other than front pay or back pay; or

j.  any amount for which the **Insured** is not financially liable or legally obligated to pay.

11. **Retaliation** means any actual or alleged response of any of the **Insureds** to:

a.  the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

b.  the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

c.  the filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

d.  any legally-protected **Employee** work stoppage or slowdown.

12. **Third-Party** means any natural person who is a customer, vendor, service provider, client, or other business

X10 USA  2120

invitee of the **Company**; provided, however, **Third-Party** shall not include any **Employee**.

13. **Third-Party Claim** means:

    a. any written demand for damages or other relief against an **Insured**;

    b. a civil judicial, administrative or arbitration proceeding against an **Insured** seeking damages or other relief, including any appeal therefrom; or

    c. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of a **Third-Party** in their capacity as such.

14. **Third-Party Wrongful Act** means any actual or alleged:

    a. harassment of a **Third-Party,** including but not limited to any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment; or

    b. discrimination against a **Third-Party,** including but not limited to any such discrimination on account of race, color, religion, age, disability or national origin.

15. **Wrongful Act** means:

    a. **Employment Practices Wrongful Act;** or

    b. **Third-Party Wrongful Act.**

## C.  EXCLUSIONS

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

1. for actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured; provided, however, this exclusion shall not apply to mental anguish, emotional distress or humiliation;

2. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. any **Wrongful Act**, fact circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

    b. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts;**

3. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants;** or

    b. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants,** or any voluntary decision to do so;

including without limitation any such **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion. Provided,

X10 USA  2121

however, this exclusion shall not apply to that part of any **Claim** under this Coverage Section where such **Claim** is for **Retaliation**.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

4.  for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law; provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**;

5.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any dishonest, deliberately fraudulent or criminal act; provided, however this exclusion shall not apply unless and until there is a final judgment against such **Insured** as to such conduct. If such excluded conduct is established through a final judgment, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges and Expenses**;

6.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

7.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a.  any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including without limitation any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission, filed or pending on or before the **Continuity Date**; or

    b.  any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission;

8.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance, or situation which any of the **Insured Persons** who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the **Continuity Date** where such **Insured Persons** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

9.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged responsibility, obligation or duty of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or pension benefits or similar law; provided, however, this exclusion shall not apply to any such **Claim** alleging **Retaliation**; or

10. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D.  **LIMIT OF LIABILITY AND RETENTIONS**

X10 USA 2122

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3.1. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

   a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss**, subject to additional payments for **Costs, Charges and Expenses** as further described in subsection b. immediately below.

   b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in subsection a. immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

   c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability under this Coverage Section and the Limit of Liability set forth in 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim**, and such **Claim** shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

   a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

   b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limit(s) of Liability, and payment of **Costs, Charges and Expenses** reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

## E. NOTIFICATION

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the expiration of the **Policy Period**, whichever is later. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the end of the **Extended Period**, whichever is later.

2. If, during the **Policy Period** or the **Discovery Period**, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the **Wrongful Act** allegations anticipated;

   b. the identity of the potential claimants;

X10 USA 2123

    c.  the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    d.  the identity of the **Insureds** allegedly involved;

    e.  the consequences which have resulted or may result; and

    f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

    3.  Notice to **Insurer** shall be given to the address specified in Item 8. of the Declarations for this **Policy**.

F.  **SETTLEMENT AND DEFENSE**

    1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

    2.  The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

    3.  Notwithstanding subsection 1. above, in the event that any **Claim** is brought as a class action, and all or any part of such **Claim** involves any actual or alleged violation of the Fair Labor Standards Act of 1938, as amended, or any similar state law, regulation or code, then it shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any such **Claim**.

    4.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

    5.  If the **Insurer** does not have the duty to defend a **Claim**, then the **Insurer** shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

    6.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim, the Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

    7.  If the Insurer does not have the duty to defend a **Claim** , the **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Costs, Charges and Expenses**, which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Costs, Charges and Expenses** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Costs, Charges and Expenses** under the terms and conditions of this **Policy.**

G.  **OTHER INSURANCE**

    1.  For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance; provided that with respect to that portion of an **Employment Practice Claim** made against any leased, temporary or independently contracted **Employee**, **Loss**, including **Costs, Charges and Expenses**, payable on behalf of such **Employee** under this Coverage Section will be specifically excess of and will not contribute with such

X10 USA  2124

other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such insurance is specifically stated to be in excess over the Limit of Liability of this Coverage Section.

2.   For any **Third-Party Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be in excess over the Limit of Liability of this Coverage Section.

H.  **ALLOCATION**

If the **Insurer** does not have the duty to defend a **Claim**, then the following subsections shall apply to such **Claim**.

1.   If, in any **Claim** covered in whole or in part under this Coverage Section, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others, or incur an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained by the parties to covered and uncovered matters.

2.   If there can be an agreement between **Insureds** and the **Insurer** on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis covered **Costs, Charges and Expenses**. If there can be no agreement on allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis **Costs, Charges and Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated or arbitrated.

3.   Any negotiated or arbitrated allocation of **Costs, Charges and Expenses** on account of a **Claim** shall be applied retroactively to all **Costs, Charges and Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim** or any other **Claim**.

X10 USA  2125

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

### A.  INSURING CLAUSES

1.  The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2.  The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3.  The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

### B.  DEFINITIONS

1.  **Claim** means:

    a.  a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

    b.  a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

    c.  a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

    d.  a criminal proceeding against any **Insured** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

    e.  an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

    f.  a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2.  **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

3.  **Costs, Charges and Expenses** means:

    a.  reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds**

EKI-P-1 (04/08)

X10 USA  2126

in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability; and

b.   reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company**, to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**.

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4.   **Directors and Officers** means any person who was, now is, or shall become:

a.   a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

b.   a person who was, is or shall become a full-time or part-time employee of the **Company**; and

c.   the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5.   **Insured** means the **Company** and the **Directors and Officers**.

6.   **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7.   **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1. or 2. or the **Company** under Insuring Clause 3. **Loss** does not include:

a.   taxes, fines or penalties;

b.   matters uninsurable under the laws pursuant to which this **Policy** is construed;

c.   punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

d.   the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

e.   any amount for which the **Insured** is not financially liable or legally obligated to pay;

f.   the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

g.   any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8.   **Outside Entity** means:

a.   any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

b.   any other company specifically identified by endorsement to this **Policy**.

X10 USA  2127

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;

    b. any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    c. the **Company**, but only with respect to Insuring Clause 3. of this Coverage Section.

## C. EXCLUSIONS

1. Exclusions Applicable to All Insuring Clauses

    **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

    b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

        ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

        ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

    provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

    For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

    d. for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

X10 USA 2128

e. brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

    i. is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;

    ii. is brought or maintained by any **Insured** in the form of a cross-claim, third-party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section;

    iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

    iv. is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

    v. is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

    ii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f.i. or ii. apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

g. for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h. against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

    i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

    ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j. for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided,

X10 USA  2129

however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

    i.   such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    ii.   such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and

    iii.   such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k.   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i.   any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

    ii.   any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l.   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

m.   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of or on the right of an applicant for employment with the **Company,** or any of the **Directors and Officers,** including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

n.   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i.   any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

    ii.   the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

    iii.   any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3.b. of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

o.   for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2.   Exclusions Applicable Only to Insuring Clause A.3.

    **Insurer** shall not be liable for **Loss** on account of any **Claim**:

EKI-P-1 (04/08)

X10 USA  2130

    a.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

    b.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i.  any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services; or

        ii.  any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2.a. and 2.b. above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

### D. LIMIT OF LIABILITY AND RETENTIONS

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

    a.  The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A.1. as further described in subsection b. immediately below.

    b.  The amount set forth in Item 3.1.b. relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A.1. in addition to the limit described in subsection a. immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

    c.  The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The Limit of Liability set forth in Items 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

    a.  the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

X10 USA  2131

    b.  the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

    4.  The Retention applicable to Insuring Clause 2. shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Company** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of the **Company's** financial insolvency.

    5.  Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduce the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

## E.  NOTIFICATION

    1.  The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

    2.  If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

        a.  a description of the **Wrongful Act** allegations anticipated;

        b.  the identity of the potential claimants;

        c.  the circumstances by which the **Insureds** first became aware of the **Wrongful Act;**

        d.  the identity of the **Insureds** allegedly involved;

        e.  the consequences which have resulted or may result; and

        f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim.**

    3.  Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

## F.  SETTLEMENT AND DEFENSE

    1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

    2.  The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

    3.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has

X10 USA 2132

not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(**s**).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

## G. OTHER INSURANCE

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss,** subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

## H. PAYMENT PRIORITY

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then remaining Limit of Liability applicable to the **Loss,** the **Insurer** shall pay the **Loss,** subject to such Limit of Liability, in the following priority:

   a. First, the **Insurer** shall pay any **Loss** covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

   b. Second, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

   c. Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company,** delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

X10 USA  2133

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 1 | |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ADDITIONAL PARENT COMPANY**

The following **Parent Company** is added to Item 1. of the Declarations:

X 10 USA
ORCA Monitoring Services, LLC
X 10 Home Controls

All other terms and conditions of this **Policy** remain unchanged.

EKI-45 (04/08)                                                                                       Page 1 of 1

X10 USA  2134

| Scottsdale Indemnity Company | ENDORSEMENT NO. 2 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ALLOCATION PROVISION**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

The following Section O., **ALLOCATION**, is added to the General Terms and Conditions Section.

O.  **ALLOCATION**

1.  In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then:

    a.  this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and

    b.  there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

2.  In the event the **Insured** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then the **Insured** and the **Insurer** shall use their best efforts to determine a fair and proper allocation as between such insured and uninsured loss, taking into account the relative legal and financial exposures and the relative benefits obtained.

All other terms and conditions of this **Policy** remain unchanged.

EKI-782 (01/09)

Page 1 of 1

X10 USA  2135

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 3 | |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF INSURED PERSONS**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Under Section **B. DEFINITIONS**, paragraph 7.a. (Persons Insured) is replaced by:

    a.   a director, officer, member of the management board, or management committee member of the **Company**;

**All other terms and conditions of this Policy remain unchanged.**

EKI-167 (04/08)

Page 1 of 1

X10 USA  2136

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 4 |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### AMEND DISCOVERY ELECTION-90 DAYS

This endorsement modifies insurance provided under the following:

#### GENERAL TERMS AND CONDITIONS

Section H., **DISCOVERY PERIOD**, subsection 2., is replaced by:

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within ninety (90) days after the effective date of cancellation, or, in the event of a refusal to renew, within ninety (90) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

All other terms and conditions of this **Policy** remain unchanged.

EKI-787 (01/09)

X10 USA  2137

| Scottsdale Indemnity Company | ENDORSEMENT NO. 5 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29408 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE OF CIRCUMSTANCES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the facts, circumstances, or allegations anticipated;

   b. the identity of potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

   then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notices was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-6 (04/08)                                                                                                         Page 1 of 1

| Scottsdale Indemnity Company | ENDORSEMENT NO. 6 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE OF CIRCUMSTANCES**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2.  If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a.  a description of the facts, circumstances, or allegations anticipated;

   b.  the identity of the potential claimants;

   c.  the circumstances by which the **Insureds** first became aware of the facts or circumstances;

   d.  the identity of the **Insureds** allegedly involved;

   e.  the consequences which have resulted or may result; and

   f.  the nature of the potential monetary damages and non-monetary relief;

   then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-7 (04/08)                                                                                                  Page 1 of 1

X10 USA  2139

| Scottsdale Indemnity Company | ENDORSEMENT NO. 7 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - D&O**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

EKI-8 (04/08)

Page 1 of 1

X10 USA  2140

| Scottsdale Indemnity Company | | | | ENDORSEMENT NO. 8 |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - EPL**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

The following is added to Section **E. NOTIFICATION**, subsection **1.**:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-9 (04/08)

Page 1 of 1

X10 USA  2141

| Scottsdale Indemnity Company | ENDORSEMENT NO. 9 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION 60 DAYS - EPL**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section E., **NOTIFICATION**, subsection 1. is replaced by:

The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period**.

All other terms and conditions of this **Policy** remain unchanged.

EKI-832 (05/09)

Page 1 of 1

X10 USA  2142

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 10 |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE - EPL**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is replaced by:

G.   **OTHER INSURANCE**

For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

All other terms and conditions of this **Policy** remain unchanged.

EKI-810 (01/09)

X10 USA  2143

| Scottsdale Indemnity Company | ENDORSEMENT NO. 11 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND OTHER INSURANCE TO BE PRIMARY - D&O

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section G., **OTHER INSURANCE**, is replaced by:

G.  **OTHER INSURANCE**

For any **Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.

EKI-199 (04/08)

Page 1 of 1

X10 USA  2144

# Scottsdale Indemnity Company

**ENDORSEMENT NO. 12**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### AMEND OUTSIDE SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

#### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection **1.**, paragraph **j.**, subparagraph ii. is replaced by:

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**, or is unable to indemnify such **Directors and Officers** as a result of **Financial Impairment**; and

For the purposes of this endorsement **Financial Impairment** means the status of the **Outside Entity** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Outside Entity**, or (2) in the event a bankruptcy proceeding shall be instituted by or against the **Outside Entity**, the **Outside Entity** becoming a debtor-in-possession.

All other terms and conditions of this **Policy** remain unchanged.

EKI-14 (01/09)

Page 1 of 1

X10 USA  2145

| **Scottsdale Indemnity Company** | | | | ENDORSEMENT NO. 13 |
| --- | --- | --- | --- | --- |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND POLLUTION EXCLUSION - SIDE A

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section C., **EXCLUSIONS**, subsection 1.c., is deleted in its entirety and replaced by the following:

c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

    ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to:

- **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company**; or

- any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

All other terms and conditions of this **Policy** remain unchanged.

EKI-846 (11/09)                                                                                                                     Page 1 of 1

X10 USA  2146

| Scottsdale Indemnity Company | ENDORSEMENT NO. 14 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND SUBROGATION PROVISION - FINAL JUDGMENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section L., **ASSISTANCE, COOPERATION AND SUBROGATION**, is deleted in its entirety and replaced by the following:

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require. In no event, however, shall the **Insurer** exercise its right of subrogation against an **Insured** under this **Policy** unless such **Insured** has been convicted of a deliberate criminal act; or has committed a deliberate fraudulent act, if a final judgment establishes that such deliberate fraudulent act was committed; or has obtained any profit or advantage to which a final judgment establishes the **Insured** was not legally entitled.

All other terms and conditions of this **Policy** remain unchanged.

EKI-784 (01/09)                                                                                              Page 1 of 1

X10 USA  2147

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 15 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

AMEND THIRD PARTY

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES COVERAGE SECTION

Section **B. DEFINITIONS**, subsection **12**, is replaced by:

12. **Third Party** means any customer, client, or other group or natural person other than an **Employee** or applicant for employment with the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-15 (04/08)

Page 1 of 1

X10 USA  2148

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 16 |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### AMEND WARRANTY PROVISION NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

#### GENERAL TERMS AND CONDITIONS

Section D., **WARRANTY**, subsection 2. is replaced by:

2.  In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

    a.  any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**;

    b.  any **Company** or **Sponsor Company** to the extent it indemnifies any **Insured** referred to in subsection a. above; and

    c.  any **Company**, **Sponsor Company**, **Plan**, **Employee Benefit Plan**, or any other entity that is an **Insured**, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the **Parent Company** knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**.

    With respect to any statement, representation or information contained in the **Application**, or in the materials submitted or required to be submitted therewith, and solely with respect to the above exclusion, no knowledge possessed by any **Insured** who is a natural person shall be imputed to any other **Insured** who is a natural person.

The following condition is added:

#### NON-RESCINDABLE

The **Insurer** shall not be entitled under any circumstances to rescind any Coverage Section of the **Policy** with respect to any **Insured**. Nothing contained in this section shall limit or waive any other rights or remedies available to the **Insurer**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2149

X10 USA  2150

# Scottsdale Indemnity Company

### ENDORSEMENT NO. 17

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED DEFINITION OF DIRECTORS & OFFICERS - LEASED / CONTRACTED EMPLOYEES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-202 (04/08)

Page 1 of 1

X10 USA  2151

| Scottsdale Indemnity Company | ENDORSEMENT NO. 18 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph iii. is replaced by:

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**, including any such **Claim** brought or maintained under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistle-blower" provision of any law.

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2152

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 19 | |
|---|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
|---|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### AMENDED INSURED VERSUS INSURED EXCLUSION - FOREIGN JURISDICTION

This endorsement modifies insurance provided under the following:

#### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection 1. is amended by adding the following to paragraph e.:

is brought or maintained in a jurisdiction outside the United States of America, Canada or Australia by any **Insured** of the **Company** solely where such **Company** is domiciled or chartered in such foreign jurisdiction;

All other terms and conditions of this **Policy** remain unchanged.

EKI-845 (05/09)

Page 1 of 1

X10 USA  2153

| Scottsdale Indemnity Company | ENDORSEMENT NO. 20 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION WITH CREDITOR COMMITTEE CARVEBACK**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph v. is deleted in its entirety and replaced by the following:

    v.  is brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for, or creditors' committee of, the **Company**, or any assignee thereof;

All other terms and conditions of this **Policy** remain unchanged.

EKI-783 (01/09)

Page 1 of 1

X10 USA  2154

| **Scottsdale Indemnity Company** | | | ENDORSEMENT<br>NO. 21 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### COST OF INVESTIGATIONS COVERAGE

This endorsement modifies insurance provided under the following:

#### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that:

The following is added to Section B., **DEFINITIONS**:

**Cost of Investigation** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company,** to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**.

Section B., **DEFINITIONS**, subsection 1., paragraph b. is deleted in its entirety and is replaced by:

    b.  a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company,** to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company;**

Section B., **DEFINITIONS**, subsection 3., paragraph b. is deleted in its entirety and is replaced by:

    b.  cost of investigation.

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2155

# Scottsdale Indemnity Company

## ENDORSEMENT NO. 22

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### DELETE PARAGRAPH III. FROM EXCLUSION N.

This endorsement modifies insurance provided under the following:

#### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that Section C., **EXCLUSIONS**, subsection 1., paragraph n. iii. is deleted in its entirety.

All other terms and conditions of this **Policy** remain unchanged.

EKI-775 (01/09)

Page 1 of 1

| Scottsdale Indemnity Company | | | | ENDORSEMENT NO. 23 |
| --- | --- | --- | --- | --- |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EMPLOYED LAWYERS EXTENSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B.4.:

**Employed Lawyers** of the **Company**

The following definition is added to Section **B.**:

**Employed Lawyers** means:

employees of the **Company** who:

1.  are admitted to practice law in one or more jurisdictions in the United States of America; and

2.  are employed within the **Company's** office of the general counsel or its functional equivalent; and

3.  acting solely in the capacity of providing professional legal services to the **Company**.

An individual shall not be deemed to be an **Employed Lawyer** to the extent such individual renders or rendered professional legal services to persons or entities other than the **Insureds**.

X10 USA  2157

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 24 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXTRADITION COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

o an official request for **Extradition** of any of the **Directors and Officers**; or the execution of a warrant for the arrest of any of the **Directors and Officers** where such execution is an element of **Extradition**.

The following is added to Section B., **DEFINITIONS**, subsection 3.:

**Costs, Charges and Expenses** means:

o reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** resulting from any of the **Directors and Officers** lawfully:

   i. opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of any of such **Directors and Officers**; or

   ii. appealing any order or other grant of **Extradition** of any of such **Directors and Officers**.

The following is added to Section B., **DEFINITIONS**:

**Extradition** means any formal process by which any of the **Directors and Officers** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms and conditions of this **Policy** remain unchanged.

EKI-788 (01/09)                                                                                              Page 1 of 1

X10 USA  2158

| Scottsdale Indemnity Company | ENDORSEMENT NO. 25 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**IMMIGRATION CLAIM ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

I.  It is agreed that the Employment Practices Coverage Section is amended as follows:

The following is added to Section A., **INSURING CLAUSES:**

**Immigration Claim** Insuring Clause

**Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Immigration Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for an **Immigration Wrongful Act** taking place prior to the end of the **Policy Period**.

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Immigration Claim**.

The following is added to Section B., **DEFINITIONS**, subsection 15.:

**Immigration Wrongful Act**.

The following is added to Section B., **DEFINITIONS**:

**Immigration Wrongful Act** means any actual or alleged violation(s) of the Immigration Control Act of 1986 or any other similar federal or state laws or regulations.

**Immigration Claim** means any criminal investigation of any of the **Insureds** by any governmental agency for actually or allegedly hiring or harboring illegal aliens.

The following is added to Section G., **OTHER INSURANCE:**

For any **Immigration Claim**, if any **Costs, Charges and Expenses** covered under this Coverage Section are covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

II.  It is agreed that the DECLARATIONS is amended as follows:

The maximum aggregate Limit of Liability for all **Costs, Charges and Expenses** as a result of all

EKI-785 (01/09)                                                                                                    Page 1 of 2

X10 USA  2159

**Immigration Claims** shall be $100,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses,** shall not be applicable to or available for any **Immigration Claim.**

The following is added to Item 3., Employment Practices Coverage Section, section 2., **Retention,** of the Declarations:

$5,000 each **Immigration Claim**

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2160

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 26 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PROFESSIONAL SERVICES EXCLUSION - SECURITIES HOLDER EXCEPTION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services, provided, however, this exclusion shall not apply to any **Claim(s)** brought by a securities holder of the **Company** in their capacity as such.

**All other terms and conditions of this Policy remain unchanged.**

EKI-165 (04/08)

X10 USA 2161

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 27 |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

REMOVAL OF ALTERNATIVE DISPUTE RESOLUTION PROVISION

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

Section **J. ALTERNATIVE DISPUTE RESOLUTION** is deleted in its entirety.

**All other terms and conditions of this Policy remain unchanged.**

EKI-37 (04/08)

Page 1 of 1

X10 USA  2162

| Scottsdale Indemnity Company | ENDORSEMENT NO. 28 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### SCIENTIFIC AND ADVISORY BOARD EXTENSION

This endorsement modifies insurance provided under the following:

#### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

a natural person member of the Scientific or Advisory Board of the **Company** (collectively "**Advisory Board Members**") that is indemnified by the **Company** pursuant to a written indemnification agreement. The **Company** agrees to indemnify the **Advisory Board Members** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Advisory Board Member** to indemnification, where permitted by law to do so. The financial ability of any **Advisory Board Member** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Advisory Board Member**.

**All other terms and conditions of this Policy remain unchanged.**

EKI-19 (04/08)

Page 1 of 1

X10 USA  2163

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 29 | |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### STATE AMENDATORY INCONSISTENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

It is agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this **Policy** and any term or condition of this **Policy**, then where permitted by law, the **Insurer** shall apply those terms and conditions of either the amendatory endorsement or the **Policy** which are more favorable to the **Insured**.

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2164

| Scottsdale Indemnity Company | | | ENDORSEMENT NO. 30 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### TOLLING OR WAIVING THE STATUTE OF LIMITATIONS

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section B., **DEFINITIONS**, subsection 1.:

    **Claim** means:

        a written request received by the **Company** to toll or waive the statute of limitations regarding a potential **Claim**. Such **Claim** shall be commenced by the receipt of such request.


All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2165

# Scottsdale Indemnity Company | ENDORSEMENT NO. 31

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### WAGE AND HOUR CLAIM ENDORSEMENT

This endorsement modifies insurance provided under the following:

#### EMPLOYMENT PRACTICES COVERAGE SECTION

I.   It is agreed that the Employment Practices Coverage Section is amended as follows:

Section A., **INSURING CLAUSES**, is amended by adding the following:

3.   **Wage and Hour Claim** Insuring Clause

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Wage and Hour Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section **E.1.** herein, for a **Wage and Hour Wrongful Act** taking place prior to the end of the **Policy Period**.

Section B., **DEFINITIONS**, subsection 1. is amended by adding the following:

c.   **Wage and Hour Claim.**

Section B., **DEFINITIONS**, subsection 15. is amended by adding the following:

c.   **Wage and Hour Wrongful Act.**

Section B., **DEFINITIONS**, is amended by adding the following:

**Wage and Hour Wrongful Act** means any actual or alleged violation(s) of the Fair Labor Standards Act or any similar federal, state or local law governing or relating to the payment of wages, overtime, on-call time, rest periods, minimum wages or the classification of **Employees** for the purpose of determining **Employees'** eligibility for compensation under such law(s); provided, however, **Wage and Hour Wrongful Act** shall not include actual or alleged violations of the Equal Pay Act of 1963, and any amendments thereto.

**Wage and Hour Claim** means:

a.   a written demand against an **Insured** for damages or other relief; or

b.   a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

brought by or on behalf of one or more **Employees** solely alleging any **Wage and Hour Wrongful Act**, including any class action or a collective action under § 216(b) of the Fair Labor Standards Act

EKI-766 (01/09)                                                                                          Page 1 of 2

X10 USA  2166

or any similar federal, state or local law.

Section F., **SETTLEMENT AND DEFENSE**, subsection 3. is deleted in its entirety.

Section G., **OTHER INSURANCE**, is amended by adding the following:

> For any **Wage and Hour Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

Section H., **ALLOCATION**, is deleted in its entirety.

II.   It is agreed that the DECLARATIONS is amended as follows:

> The maximum aggregate Limit of Liability for all **Loss** as a result of all **Wage and Hour Claims** shall be $250,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to or available for any **Wage and Hour Claim**

> Item 3., Employment Practices Coverage Section, section 2., **RETENTION**, of the Declarations is amended by adding the following:

> > $5,000 each **Wage and Hour Claim**

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2167

| Scottsdale Indemnity Company | ENDORSEMENT NO. 32 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKI3036412 | 4/7/2011 | X10 Wireless Technology, Inc. | 29406 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDATORY ENDORSEMENT - WASHINGTON**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS
CRIME COVERAGE SECTION
APPLICATION FOR BUSINESS AND MANAGEMENT (BAM) INDEMNITY INSURANCE
RENEWAL APPLICATION FOR BUSINESS AND MANAGEMENT (BAM) INDEMNITY INSURANCE**

I.  The following apply to the Crime Coverage Section if included in this **Policy**.

Under Section D., **OTHER CONDITIONS**, paragraph 6.a., Termination of this Coverage Section is deleted in its entirety:

II.  The following applies to the General Terms And Conditions form.

Section E., **CANCELLATION**, is replaced by:

**E.   CANCELLATION AND NON-RENEWAL**

1.  Cancellation

a.  By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety, any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

b.  This **Policy** may be cancelled by the **Insurer** only for non-payment of premium, by mailing written notice to the **Parent Company**, any additional **Parent Companies** added by endorsement hereto and the agent or broker who placed this policy with the **Insurer**, stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

c.  If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

EKI-300-WA (04/08)                                                                              Page 1 of 2

X10 USA  2168

2. Non-Renewal

If the **Insurer** elects not to renew this **Policy**, the **Insurer** may do so by giving written notice of non-renewal to the **Parent Company**, any additional **Parent Companies** added by endorsement hereto and the agent or broker who placed this policy with the **Insurer**, stating the specific reason for non-renewal at least forty-five (45) days before the expiration date. Otherwise, the **Insurer** will renew this policy unless:

    a. The **Parent Company** fails to pay the renewal premium after the **Insurer** has expressed its willingness to renew, including a statement of the renewal premium, to the **Parent Company** and the insurance agent or broker who placed this policy with the **Insurer** at least twenty (20) days before the expiration date;

    b. Other coverage acceptable to the **Parent Company** has been procured prior to the expiration date of the policy.

III. If the **Application** for Business and Management (BAM) Indemnity Insurance is applicable to this **Policy**, paragraph 4. of **OTHER INFORMATION** is replaced by:

    4. It is agreed that in the event there is any misstatement or untruth, made with the intention to deceive, in the answers to the questions contained herein, the **Insurer** has the right to exclude from coverage any claim based upon, arising out of or in connection with such misstatement or untruth.

All other terms and conditions of this **Policy** remain unchanged.

X10 USA  2169

# Scottsdale Indemnity Company

### POLICYHOLDER DISCLOSURE

### NOTICE OF TERRORISM
### INSURANCE COVERAGE

## TERRORISM RISK INSURANCE ACT

Under the Terrorism Risk Insurance Act of 2002, as amended pursuant to the Terrorism Risk Insurance Program Reauthorization Act of 2007, effective January 1, 2008 (the "Act"), you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "certified acts of terrorism" means any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that where coverage is provided by this policy for losses resulting from "certified acts of terrorism," such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided below and does not include any charges for the portion of loss that may be covered by the Federal Government under the Act.

You should also know that the Act, as amended, contains a $100 Billion Cap that limits United States Government reimbursement as well as insurers' Liability for losses resulting from "certified acts of terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

## CONDITIONAL TERRORISM COVERAGE

The federal Terrorism Risk Insurance Program Reauthorization Act of 2007 is scheduled to terminate at the end of December 31, 2014, unless renewed, extended or otherwise continued by the federal government. Should you select Terrorism Coverage provided under the Act and the Act is terminated December 31, 2014, any terrorism coverage as defined by the Act provided in the policy will also terminate.

## IN ACCORDANCE WITH THE ACT, YOU MUST CHOOSE TO SELECT OR REJECT COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" BELOW:

| | |
|---|---|
| X | I hereby elect to purchase certified terrorism coverage for a premium of $85.00. I understand that the federal Terrorism Risk Insurance Program Reauthorization Act of 2007 may terminate on December 31, 2014. Should that occur my coverage for terrorism as defined by the Act will also terminate. |
| | I hereby reject the purchase of certified terrorism coverage. |

NOTI0164CW (01/08)

X10 USA 2170

X10 Wireless Technology, Inc.
_____
Named Insured / Firm

_____
Policyholder / Applicant's Signature\*

EKI3036412
_____
Policy Number, if available

_____
Print Name\*

_____
Date\*

\*If rejected, signature required & completed form must be faxed to E-Risk Services @ (973) 252-5146. Please contact your broker with any questions.

X10 USA  2171

EXHIBIT B

1
2
3
4
5
6
7

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

8
9

Susan Peder, as assignee,

10                                   Plaintiff,

11          v.                                          NO.

12  X10 USA, Inc., a New Jersey Corporation, X10          **COMPLAINT FOR DAMAGES**
    Wireless Technology, Inc., a Delaware Corporation,
13  David Mayer and Jane Doe Mayer,  and the marital
    community comprised thereof, and Jacqueline Voss
14  Schott and John Doe Voss Schott, and the martial
    community comprised thereof,
15                                   Defendants.
16

17          Plaintiff, Susan Peder, through her undersigned counsel, makes the following

18  allegations and requests for relief:

19                  **I.      PARTIES, JURIDICTION, AND VENUE**

20          1.      At all times relevant, Ms. Peder and her former spouse Alexander Peder were

21          residents of King County, Washington.
22
            2.      At all times relevant, Defendants David Mayer and Jane Doe Mayer are
23
            believed to have been  residents of Pierce County, Washington.
24
25          3.      At all times relevant, Defendants Jacqueline Voss Schott and John Doe Voss

26          Schott are believed to have been residents of King County, Washington.

27

Complaint for Damages - 1

BOYLE ● MARTIN, PLLC
1823 TENTH AVENUE WEST
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

4.   At all times relevant, Defendants X10 USA, Inc. ("X10 USA") and X10

Wireless Technology, Inc. ("X10 WTI") (collectively X10) were, and remain,

licensed to do business in the state of Washington and maintain their principal

place of business in Renton, Washington.

5.   Between 1996 and 2010 Alexander Peder was employed by X10.

6.   Ms. Peder was married to Alexander Peder during all relevant times.  In 2011,

the Peders divorced and pursuant to the final Decree of Dissolution Ms. Peder

was assigned all rights to and benefits of any causes of action, settlements,

verdicts or judgments arising from or related to Mr. Peder's employment with

X10.

7.   This Court has jurisdiction over the subject matter of this action pursuant to

RCW 2.08.010.

8.   Venue is proper as the parties conduct business in or reside in King County,

and all relevant transactions occurred in King County, Washington.

## II.   FACTS

9.   On or around July 11, 1996, Mr. Peder was hired as the president of the retail

sales division of X10 USA by George Stevenson, the CEO of X10 USA and

the founder, president, and a director of X10 Limited ("X10, Ltd."), the parent

company of X10 USA.  It is also believed that Mr. Stevenson, who exercised

daily control over X10 USA, is also a majority shareholder in both X10 USA

and X10 Ltd.

10.  In his position as President, Mr. Peder reported directly to Mr. Stevenson.

11.  While Mr. Peder was employed by X10 USA, the US sales arm of X10 Ltd.,

Complaint for Damages - 2

BOYLE ● MARTIN, PLLC
1823 TENTH AVENUE WEST
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

X10 WTI, was formed.

12.     X10 USA and X10 WTI ("X10") were highly integrated enterprises sharing
among other resources, a website, office, phone and fax numbers, service
providers, and employees.  In addition, Mr. Peder provided services for both
companies, and like X10 USA, Mr. Stevenson also exercised daily control of
X10 WTI.

13.     In 2007, X10 experienced managerial discontinuity, decrease in growth, and
financial problems.   In or around February 2008, Mr. Stevenson and Mr. Peder
had a meeting during which Mr. Stevenson expressed dissatisfaction with the
direction of X10 and his desire to make major changes, including possibly
terminating senior executives.

14.     Mr. Stevenson did not want Mr. Peder to leave X10 until a decision had been
made regarding what changes, if any, were going to be made.  To induce Mr.
Peder to remain at X10 during that time, Mr. Stevenson told Mr. Peder that
upon his separation from X10 he would be paid a severance package of one
year's salary and benefits if he committed to staying with X10 until year's end,
or until X10 made decisions regarding the employment of its senior executives,
whichever occurred first.

15.     Mr. Peder accepted Mr. Stevenson's offer and stayed in his position with X10
instead of pursing other employment and business opportunities.

16.     In early December 2008, Mr. Peder was informed that he was going to be
taken off payroll, and on December 24, 2008 he received his final paycheck
from X10.

Complaint for Damages - 3

17.  Mr. Peder's final paycheck reflected accrued vacation time of 559.88 hours. X10's written employment policy unequivocally provides that upon separation an employee will be paid the cash value for all accrued and unused vacation time through the last day of work.

18.  Jacqueline Voss Schott as the Director of Human Resources, Vice President of Finance, and Chief Financial Officer of X10 was responsible for issuing Mr. Peder's paycheck.  Ms. Voss Schott did not include in Mr. Peder's final paycheck the cash value of his unused vacation time.

19.  At the time of Mr. Peder's departure as a full-time employee, his hourly rate of pay was $158.65.

20.  Initially, Mr. Peder agreed to remain at X10 after his final paycheck so that his work could be transitioned to his replacement; however, he ended up continuing to work for X10 on a part-time basis for the following 16 months. During that time X10 continued to hold Mr. Peder out as an employee, pay his health care benefits, and task him with such duties as negotiating and executing contracts, attending meetings as X10's representative, handling licensing, copyright and infringement actions and disputes, as well as addressing various internet and marketing issues.  As a result, until his departure from X10 on June 8, 2010, Mr. Peder maintained his X10 office, business cards, phone number, voicemail, email address and cell phone.  Based on the representations and requests made by X10, Mr. Peder performed the aforementioned valuable services and expected to be compensated for this work.  X10 benefited from the value of Mr. Peder's services.

BOYLE ● MARTIN, PLLC
1823 TENTH AVENUE WEST
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

21.    Despite demands for payment, including demand of David Mayer, Mr. Peder has not been compensated for his accrued vacation time, work performed January 1, 2009 to June 8, 2010, or the promised year severance pay.

## III.    CLAIMS FOR RELIEF

### First Claim For Relief: Failure to Pay Wages

22.    Ms. Peder realleges and fully incorporates the allegations set forth above.

23.    Based upon the foregoing, and as a direct result of defendants' conduct, Ms. Peder has claims against all defendants for willful and intentional violations of RCW 49.48 *et. seq.,* and RCW 49.52 *et. seq.*

24.    As a result of the defendants conduct Ms. Peder has been damaged in an amount to be proved at trial.

### Second Claim for Relief:  Breach

25.    Plaintiff realleges and fully incorporates the allegations set forth above.

26.    Based upon the foregoing, Ms. Peder has a claim against defendant X10 for breach of the oral contract to pay severance.

27.    As a result of defendant X10's breach, Ms. Peder has been damaged in an amount to be proved at trial.

### Third Claim for Relief: Quantum Meruit or Unjust Enrichment

28.    Ms. Peder realleges and fully incorporates the allegations set forth above.

29.    Based upon the foregoing, Ms. Peder has a claim against defendant X10 for Quantum Meruit, or in the alternative, Unjust Enrichment.

30.    As a result of defendant X10's conduct, Ms. Peder has been damaged in an amount to be proved at trial.

Complaint for Damages - 5

BOYLE • MARTIN, PLLC
1823 TENTH AVENUE WEST
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

### Fourth Claim for Relief:  Promissory Estoppel

31.     Ms. Peder realleges and fully incorporates the allegations set forth above.

32.     Based upon the foregoing, Ms. Peder has a claim in the alternative to her claim for Breach against defendant X10 for promissory estoppel.

33.     As a result of defendant X10's conduct, Ms. Peder has been damaged in an amount to be proved at trial.

### IV. REQUEST FOR RELIEF

Plaintiff requests the following relief from defendants:

1.     Payment for all wages due in a sum to be proven at trial;

2.     Payment of any other damage as proven at trial;

3.     Double damages for all wages owing under Washington law;

4.     Attorney fees and costs allowable under RCW 49.48.030, RCW 49.52.070;

5.     Prejudgment and post judgment interest at the statutory rate; and

6.     Other relief as the Court may deem just and equitable.

DATED this 21st day of December, 2011

BOYLE • MARTIN, PLLC

Margaret M. Boyle, WSBA No. 17089
Julie C.W. Martin, WSBA No. 38006
Attorneys for Plaintiff

Complaint for Damages - 6

EXHIBIT C



# FREEDOM SPECIALTY™

1 WORLD TRADE CENTER • 250 GREENWICH STREET • SUITE 6  33RD FLOOR • NEW YORK, NY 10007
p 212.329.6900 | f 212.329.6950 | tf 888.800.9347 • www.freedomspecialtyins.com

January, 18, 2012

Mr. Dave Mayer
X10 Wireless Technology, Inc.
620 Naches Ave. SW
Renton, WA 98057

RE:   INSURER:      SCOTTSDALE INDEMNITY COMPANY ("SCOTTSDALE")
      INSURED:      X10 WIRELESS TECHNOLOGY, INC. ("X10WTI")
      POLICY #:     EKI3036412 ("THE POLICY")
      CLAIMANT:     SUSAN PEDER
      OUR REF. #:   1207507

Dear Mr. Mayer:

This letter will acknowledge receipt of a complaint filed on or about December 21, 2011 in the Superior Court for the State of Washington In and For King County, entitled X10 USA, Inc.; X10 Wireless Technology, Inc.[1]; David Mayer and Jane Doe Mayer; and Jacqueline Voss Schott and John Doe Voss Schott, No. 11-2-44104-1KNT. This matter was noticed under Scottsdale Policy No. EKI3036412, bound for the policy period of April 7, 2011 to April 7, 2012. The Policy has a limit of liability of $1,000,000, subject to a $5,000 self-insured retention. Pursuant to the relevant policy provisions, referenced herein, we note that Costs, Charges and Expenses are within the definition of Loss and payment of such Costs, Charges and Expenses will reduce the limit of liability, accordingly. Please note that the Policy contains an additional Limit of Liability of $1,000,000 for all Costs, Charges and Expenses, subject to $2,000,000 maximum aggregate.

I will be handling this matter for Freedom Specialty Insurance Company on behalf of Scottsdale.   Please direct all correspondence and other communications to my attention using Scottsdale's reference no. 1207507. For the reasons set forth below, we will provide coverage for this matter, subject to the following reservation of rights.

---

[1] We note that X10 USA is added as an Additional Parent Company in Endorsement No. 1. Thus, both X10 USA and X10WTI will be collectively referred to throughout the letter as "X10".

Underwritten by Scottsdale Indemnity Company
A Nationwide Company

X10 USA  2176

Mr. Dave Mayer
January 18, 2012
Page 2

We are directing this letter to you as the authorized insurance representative of X10 and the individual Insureds under the above-referenced Policy. To the extent you are not acting on behalf of the inusreds for insurance coverage purposes, please forward a copy of this letter to the Insureds' authorized representative and let us know with whom we should communicate in the future concerning this matter.

I take this opportunity to provide you with Scottsdale's current position concerning coverage. Based upon the information provided to Scottsdale thus far, we understand that this matter involves a complaint filed by the wife of a former employee of X10, Susan Peder, who alleges that she and her husband were divorced and in the final decree, Ms. Peder was assigned all of Mr. Peder's rights to and benefits of any causes of action, settlements, verdicts or judgments arising from or related to Mr. Peder's employment with X10. Mr. Peder was allegedly hired as the president of the retail sales division of X10 in 1996. Ms. Peder alleges that upon her husband's separation from X10 in 2008, Mr. Peder's boss told him that upon his separation from X10, Mr. Peder would be paid a severance package of one year's salary and benefits if he committed to staying with X10 until year's end or until X10 made decisions regarding the employment of its senior executives, whichever occurred first. Ms. Peder further alleges that her husband accepted the offer to stay in his position instead of pursuing other employment and business opportunities. Shortly thereafter, Mr. Peder was allegedly told he was going to be taken off payroll. It is further alleged that Mr. Peder's final paycheck reflected accrued vacation time of 559.88 hours, but that he was not provided the cash value of all accrued and unused vacation time as per the company's policy. Ms. Peder alleges that her husband has not been compensated for his accrued vacation time, nor work performed from January 1, 2009 through June 8, 2010. As a result, Ms. Peder alleges failure to pay wages; breach of employment contract; quantum meruit or unjust enrichment; and promissory estoppel, and seeks payment of wages due in a sum to be proven at trial; payment of any other damage as proven at trial; double damages for all wages owing under Washington law; attorney fees and costs; prejudgment and post judgment interest at the statutory rate; and other relief as the Court may deem just and equitable.

Therefore, since an Employment Practices Claim based on alleged Employment Practices Wrongful Act against an Insured has been brought on behalf of a former Employee within the meaning of the Policy, coverage will be afforded to X10 and the Individual Insureds, subject to the following reservation of rights.

Initially, we note that The Policy definition of Insureds includes Insured Persons. You and Ms. Jacqueline Voss Schott are Insured Persons and consequently Insureds for this matter. Insured Persons are defined in pertinent part to include a director, officer or any employee of X10. Based upon the information provided, it appears that Ms. Jane Doe Mayer and Mr. John Doe Voss Schott are not Insured Persons as defined in the Policy. Nevertheless, at this time, we will provide a courtesy defense for Ms. Jane Doe Mayer and Mr. John Doe Voss

X10 USA  2177

Mr. Dave Mayer
January 18, 2012
Page 3

Schott to the extent that there is a unified defense with all the defendants. We reserve our rights to withdraw this defense at any time and request that all insurers which may provide coverage for these two individuals, such as homeowner or personal umbrella policy carriers, be noticed and that we be advised of their positions.

Furthermore, we note that Section B.6. of the Employment Practices Coverage Section of the Policy provides the following relevant definition:

**Employment Practices Wrongful Act** means any actual or alleged:

(a) violation of any common or statutory federal, state, or local law prohibiting any kid of employment-related discrimination;

(b) harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

(c) abusive or hostile work environment;

(d) wrongful discharge or termination of employment, whether actual or constructive;

(e) breach of an actual or implied employment contract;

(f) wrongful deprivation of a career opportunity, wrongful failure or refusal to employ or promote, or wrongful demotion;

(g) employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

(h) wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects employment-related discrimination or harassment;

(i) wrongful discipline;

(j) employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

(k) **Retaliation;**

(l) negligent evaluation; or

(m) Negligent hiring or negligent supervision of other sin connection with a. through l. above, but only if employment-related and claimed by

X10 USA 2178

Mr. Dave Mayer
January 18, 2012
Page 4

or on behalf of any Employee and only if committed or allegedly committed by any of the Insureds in their capacity as such.

In Ms. Peder's complaint, we note that her causes of action for quantum meruit - unjust enrichment nor promissory estoppel constitute Employment Practices Wrongful Acts as that term is defined above. Therefore, Scottsdale reserves all of its rights pursuant to Section B.6. of the Employment Practices Coverage Section of the Policy.

In addition, we note that Section O. of the General Terms and Conditions of the Policy as amended by Endorsement No. 2  provides that, "In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both Loss that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then: (a) this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and (b) there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such Claim between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained." Therefore, as Ms. Peder is seeking amounts that may be covered Loss and uncovered Loss, Scottsdale reserves all of its rights pursuant to the forgoing policy provision.

Furthermore, we note that Section B.10. of the Employment Practices Coverage Section of the Policy contains the following relevant definition, which provides that:

**Loss** means the damages, judgments, settlements, front pay and backpay, pre-judgment or post judgment interest awarded by a court, and **Costs, Charges** and **Expenses** incurred by any of the Insureds. **Loss** does not include:

(a) taxes, fines or penalties;

(b) matters uninsurable under the laws pursuant to which this **Policy** is construed;

(c) punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage

X10 USA 2179

Mr. Dave Mayer
January 18, 2012
Page 5

for such damages and which has a substantial relationship to the **Insureds, Insurer,** this **Policy** or the **Claim** giving rise to such damages;

(d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

(e) amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

(f) disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

(g) the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

(h) the cost of creating or reinstating employment;

(i) any amount owed as wages to any **Employee,** other than front pay or back pay; or

(j) any amount for which the Insured is not financially liable or legally obligated to pay.

Ms. Peder is seeking amounts that include those amounts owed under an employment or other contract as well as wages allegedly owed to her husband. Therefore, Scottsdale reserves all of its rights, including the right to deny coverage for any such amounts that do not constitute **Loss,** pursuant to Section B.10. of the Employment Practices Coverage Section of the Policy.

In addition, we note that Section F. of the Employment Practices Section of the Policy, entitled "Settlement and Defense" provides that "it shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**" and that "such duty to defend any **Claim** shall cease when the **Limits of Liability** have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**" Scottsdale's right and duty to defend includes the right to appoint defense counsel. To this end, as I advised, Scottsdale has appointed the law firm of Reed McClure to defend all of the defendants, with regard to the above matter. Please provide your assistance to the Reed McClure firm in regards to this matter as is provided for in the relevant policy provisions. Scottsdale reserves all of its rights pursuant to Section F. of the Employment Practices Coverage Section of the Policy.

X10 USA 2180

Mr. Dave Mayer
January 18, 2012
Page 6

Lastly, we note that Section G. of the Employment Practices Coverage Section of the Policy as amended by Endorsement No. 10, entitled "Other Insurance" states that "for any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance." Pursuant to the above language, please provide notice of this matter to all appropriate insurers if this has not already been done. Please forward to us copies of these other policies, as well as the written coverage positions of these other insurers, even if they have denied coverage. Scottsdale reserves all of its rights pursuant to Section G. of the Employment Practices Coverage Section of the Policy as amended by Endorsement No. 10.

Scottsdale's coverage position for this matter is based on presently known facts. Therefore, it is necessarily subject to change as additional allegations and facts develop through investigation or otherwise. If you have any additional information you believe should be factored into our coverage analysis, please provide us with it and we will review it for its impact on coverage.

Scottsdale expressly reserves all rights and defenses under the Policy, at law and/or in equity, whether or not specifically referenced herein, to deny coverage and/or rescind the Policy upon any terms, conditions, exclusions, endorsements and other provisions of its policy and any underlying policy, including statements, declarations and omissions made in connection with the application(s), therefore as may apply. No present or subsequent action taken by Scottsdale is to be construed as a waiver of any position set forth in this letter or any rights otherwise available to it pursuant to the Policy, at law, and/or in equity.

Please do not hesitate to contact me at (212) 329-6939, should you have any questions or wish to discuss this matter further.

Very truly yours,

Jennifer R. Weinstein

X10 USA 2181

Mr. Dave Mayer
January 18, 2012
Page 7

cc:     Mr. Mark A. Ganley, Principal
        AH&T Insurance
        (via electronic mail)

        Mr. Michael Miller
        AH&T Insurance
        (via electronic mail)

X10 USA  2182

EXHIBIT D

# BOYLE • MARTIN

1823 TENTH AVENUE WEST · SEATTLE, WA · 98119
PHONE: 206-217-9400 · FAX: 206-217-9600

VIA EMAIL (mbudelsky@rmlaw.com; ckey@rmlaw.com)

December 4, 2012

Mr. Michael Budelsky
Reed McClure, PS
1215 Fourth Avenue, Ste. 1700
Seattle, WA  98161

     Re:    *Peder v. X10 USA, et.al.*, King County Cause No. 11-2-44104-1KNT

Dear Michael:

Pursuant to the Request for Statement of Damages you have delivered to my Office, I write to set out the damages my client is asserting in the above matter:

| | | |
|---|---|---|
| WAGE LOSS: | Accrued vacation: | $88,824 (559.88 hrs. @ $158.65/hr) |
| | Severance: | $310,000 |
| OTHER: | Unjust enrichment: | $117,401 (10 hours/week @ $158.65 for 74 weeks Jan 1, 2009-June 9, 2010) |
| | Double damages: | $516,225 |
| | Attorney fees/costs: | TBD |
| | Prejudgment interest: | TBD |

As you and I discussed last week, my client is open to mediation whenever your clients become interested in such negotiations.

Sincerely,
BOYLE • MARTIN, PLLC

Margaret M. Boyle

Cc:   Susan Peder

## MUTUAL RELEASE AND SETTLEMENT AGREEMENT

This Mutual Release and Settlement Agreement ("Agreement") is effective the 27th day of June, 2013 regardless of its date of actual execution, and is entered between plaintiff Susan Peder, as assignee of Alexander Peder ("Peder"), on the one hand, and defendant X10 Wireless Technology, Inc. ("X10," and with X-10 (USA), Inc. aka X10 USA, Inc. collectively, "X10 Defendants"), on the other hand, who are litigants in an action currently pending in King County (Washington) Superior Court under Cause No. 11-2-44104-1KNT (the "Suit"). The undersigned Parties, through their authorized counsel of record, enter into this Agreement with the intent to be bound by its terms.

The Parties to this Agreement agree as follows:

1.  <u>Parties</u>.  The Parties to this Agreement are:

    (a)     Susan Peder, as assignee of Alexander Peder; and

    (b)     X10 Wireless Technology, Inc.

2.  <u>No Admission Of Damages Amount Or Ultimate Liability</u>.  This Agreement is the result of a significant compromise.  This Agreement does not constitute, and shall not at any time or for any purpose be construed or considered as, any concession, admission, or belief on Peder's part that the full damages amount for which X10 Defendants are legally liable to Peder is equal to or less than the Five Hundred Fifty Thousand dollars and no cents ($550,000) compromise settlement amount (the "Settlement Amount"), the prompt payment of which is provided for in this Agreement.  To the contrary, Peder contends X10 Defendants are liable for damages significantly exceeding the Settlement Amount set forth herein, and reserves the right to pursue such increased damages if this Agreement is nullified for any reason, including pursuant to paragraph 6 below.  Similarly, this Agreement does not constitute, and shall not at any time or for any purpose be construed or considered as, any concession, admission, or belief on X10 Defendants' part that any of them has any liability, fault, or responsibility for any of the damages or liabilities that Peder claims.  The parties enter into this Agreement solely for the purpose of avoiding costs and burdens of further litigation and the enforcement of and/or collection upon any Judgment entered at the conclusion of such litigation.

3.  <u>Payment</u>.  By no later than 5:00 p.m. on Friday, August 23, 2013, Peder shall be paid the Settlement Amount by or on behalf of X10 Defendants.

4.  <u>Release</u>.

    (a)     Peder and X10 Defendants release one another from any and all damages, demands, causes of action, actions, rights, liabilities, contractual obligations, damages, costs (including attorney fees and other litigation costs taxable under applicable law), torts, suits, debts, sums of money, accountings, reckonings, bills, covenants, controversies, agreements, promises, variances, trespasses, extents, and executions whatsoever, at law or in equity or otherwise, whether direct or indirect, known or unknown, which either party now owns or holds,

EXHIBIT E

or has at any time heretofore owned or held, or may in the future own or hold, against the other party, including without limitation all claims Peder has alleged or could have alleged against the X10 Defendants as part of the Suit, and any claims any of X10 Defendants could have made against Peder relating to the subject matter of the Suit. This release extends to all of Peder's and X10 Defendants' past and present shareholders, officers, directors, partners, members, agents, employees, representatives, insurers, attorneys, parents, subsidiaries, affiliates, predecessors, successors, transferees, and assigns, as well as all past and present shareholders, officers, directors, partners, members, agents, employees, representatives, insurers, attorneys, parents, subsidiaries, affiliates, predecessors, successors, transferees, assigns, spouses, and relations of any such person or entity.

(b)     Notwithstanding subparagraph (a) above, this release shall not extend to any claims that arise out of this Agreement or out of any of the other documents executed or delivered pursuant to this Agreement.

(c)     Each Party represents, warrants, and agrees that: (i) it understands it is releasing potentially unknown claims; (ii) this release is fairly and knowingly made; (iii) it is aware it has limited knowledge with respect to the released claims; and (iv) it specifically allocates to itself the risk of any mistake by it in entering into this Agreement.

5.     <u>Dismissal of Suit</u>.  Upon receipt of payment of the Settlement Amount specified in this Agreement, Peder shall promptly execute and deliver to X10 Defendants' counsel a stipulated order of dismissal, with prejudice and without an award of attorney fees or other costs or expenses to any party, of all claims asserted by Peder against either or both of the X10 Defendants in the Suit.  The Parties hereby waive any rights to appeal from that dismissal and/or from any judgment entered pursuant thereto.

6.     <u>Nullification</u>.  The Settlement Amount to be paid to Peder pursuant to this Agreement already reflects a significant compromise by Peder of the full damages amount for which she claims X10 Defendants are legally liable, and Peder is unwilling to enter into this Agreement if that compromise amount is to be further compromised by delays or collection problems in securing the full and timely payment of the Settlement Amount specified in this Agreement. This Agreement is therefore contingent upon:

(a)     by 4:00 p.m. on Monday, July 22, 2013, X10 Defendants' insurance carrier Scottsdale Indemnity Company ("Scottsdale") providing X10 Defendants' defense counsel (Michael Budelsky of Reed McClure: mbudelsky@rmlaw.com) by email with a binding written commitment to pay the full Settlement Amount specified in this Agreement within the time specified below, without any conditions or reservations whatsoever (including, for example, the reservation of a right of reimbursement, contribution, or subrogation from or against any person or entity purportedly resulting from that settlement payment) attached to that full payment;

(b)     X10 Defendants' personal counsel delivering by email that binding written commitment to Peder's counsel of record (Margaret Boyle of Boyle Martin, PLLC: Margaret@boylemartin.com) by 5:00 p.m. on Monday, July 22, 2013; and

     (c)    the delivery of full payment of the Settlement Amount to Peder's counsel of record (Attn: Margaret Boyle, 1823 Tenth Avenue West, Seattle, WA 98119) by 5:00 p.m. on Friday, August 23, 2013.

This Agreement is accordingly null and void in its entirety, as if never entered or executed, if Scottsdale does not provide that binding written commitment to X10 Defendants' personal counsel by 4:00 p.m. on Monday, July 22, 2013, or if the Settlement Amount is not delivered to Peder's counsel of record by 5:00 p.m. on Friday, August 23, 2013, or if any other condition set forth above in this Paragraph 6 is not satisfied.

Upon satisfaction of conditions 6(a) and (b) above, Peder agrees to prepare and file with the Court a Notice of Settlement pursuant to the applicable civil rules.  If full payment of the Settlement Amount is not made by the date set forth in condition 6(c) above, the Parties agree to stipulate to the withdrawal of that Notice of Settlement and the setting of a new trial date that will allow Peder's now-pending summary judgment motion (currently set for hearing August 9, 2013) to be re-noted for hearing, and allow all pretrial deadlines currently set for after the effective date of this Agreement to be satisfied by the applicable Party.

7.    <u>Miscellaneous</u>.

     (a)    <u>Time Of The Essence</u>.  Time is of the essence with regard to this Agreement.

     (b)    <u>Cooperation</u>.  The Parties agree to properly and promptly execute and deliver any and all additional documents that may be necessary or desirable to render this Agreement legally and practically effective.  This paragraph shall not require the execution of any document that expands, alters, or in any way changes the terms of this Agreement.

     (c)    <u>Counterparts</u>.  This Agreement may be executed in any number of identical counterparts, notwithstanding that all Parties have not signed the same counterpart, with the same effect as if all Parties had signed the same document.  All counterparts shall be construed as and shall constitute one and the same Agreement.  Facsimile or pdf signatures shall suffice as originals.

     (d)    <u>Waiver</u>.  Any of the terms or conditions of this Agreement may be waived, but only by a written notice signed by the Party waiving such terms or conditions.

     (e)    <u>Authority</u>.  The undersigned represent and warrant that they have full right, power, and actual authority to enter into and execute this Agreement on behalf of themselves and any entity or person they purport to represent, to grant the benefits granted by this Agreement, to incur the obligations set forth in this Agreement, and to carry out all actions required of them by this Agreement.  The Parties further represent and warrant that they own or have the right to release each and all of the claims they purport to release in this Agreement, and have not transferred any interest in any of the released claims to any third-party.

     (f)    <u>Conformance to Applicable Law.</u>  Without waiving any right to invoke another state's laws with respect to any other issues or disputes involving them, the parties agree that this

Agreement shall be governed by and construed pursuant to Washington law. If any part of this Agreement fails to comply with any applicable law such that it cannot be enforced in its entirety, then this Agreement shall be deemed conformed to the extent needed to comply with applicable law.

      (g)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the Suit and the claims released by this Agreement. This is a negotiated Agreement drafted by the Parties, and no ambiguity shall be construed against any Party based upon a claim that that Party drafted the ambiguous language. This Agreement supersedes and replaces all prior agreements, discussions, and representations, all of which are merged into, and superseded by, this Agreement. No Party is entering into this Agreement in reliance upon any oral or written promises, inducements, representations, understandings, interpretations, or agreements other than those contained in this Agreement. The Parties each acknowledge, represent, and agree (i) that they have read this Agreement, (ii) that they fully understand the terms of this Agreement, (iii) that they have been fully advised by their legal counsel, accountants, and other advisors with respect to this Agreement, and (iv) that they are executing this Agreement upon the advice and recommendation of their independent legal counsel.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed at Seattle, Washington, effective the date first mentioned above.

SUSAN PEDER, as assignee of ALEXANDER PEDER

By: _____
Its: _____

X10 WIRELESS TECHNOLOGY, INC.

By: _David Mayu_____
Its: _President / CEO_____

Agreement shall be governed by and construed pursuant to Washington law.  If any part of this Agreement fails to comply with any applicable law such that it cannot be enforced in its entirety, then this Agreement shall be deemed conformed to the extent needed to comply with applicable law.

      (g)    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the Suit and the claims released by this Agreement.   This is a negotiated Agreement drafted by the Parties, and no ambiguity shall be construed against any Party based upon a claim that that Party drafted the ambiguous language.  This Agreement supersedes and replaces all prior agreements, discussions, and representations, all of which are merged into, and superseded by, this Agreement.  No Party is entering into this Agreement in reliance upon any oral or written promises, inducements, representations, understandings, interpretations, or agreements other than those contained in this Agreement.   The Parties each acknowledge, represent, and agree (i) that they have read this Agreement, (ii) that they fully understand the terms of this Agreement, (iii) that they have been fully advised by their legal counsel, accountants, and other advisors with respect to this Agreement, and (iv) that they are executing this Agreement upon the advice and recommendation of their independent legal counsel.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed at Seattle, Washington, effective the date first mentioned above.

SUSAN PEDER, as assignee of ALEXANDER PEDER

By: _____

Its: _____

X10 WIRELESS TECHNOLOGY, INC.

_____

By: _____

Its: _____

## CR2A AGREEMENT (SUBJECT TO INSURER FUNDING)

Pursuant to CR 2A of the Washington Civil Rules, Plaintiff Susan Peder, as assignee of Alexander Peder ("Peder") and defendant X10 Wireless Technology, Inc. ( "X10"), through their duly authorized counsel of record, agree to settle the action captioned *Peder v. X10 USA, Inc.*, et al. King County (Washington) Superior Court under Cause No. 11-2-44104-1KNT (the "Suit") pursuant to the following terms:

1.       The Parties agree to settle the Suit for the amount of $550,000 to be paid to Peder. This settlement is expressly conditioned upon X10's defending insurer Scottsdale Indemnity Company ("Scottsdale") taking the following actions on or before the following deadlines: (a) Scottsdale providing a binding written commitment to fund the entire $550,000 settlement amount without any conditions or reservations whatsoever, on or before close of business July 22, 2013; and (b) Scottsdale actually delivering payment of that $550,000 settlement amount to Peder's counsel on or before close of business August 23, 2013. This Agreement is accordingly null and void in its entirety, as if never entered or executed, if Scottsdale does not provide that binding written commitment or deliver the payment of the $550,000 Settlement Amount by those respective deadlines. If Scottsdale fails to satisfy any of the foregoing conditions, the Parties will cooperate in seeking to re-set the trial date and pending motion.

2.       Upon Scottsdale's satisfaction of the foregoing conditions, the Parties agree to release any and all claims that were or could have been asserted by either Party in the Suit.

3.       Upon Scottsdale's satisfaction of the foregoing conditions, the Parties will stipulate to entry of an Order dismissing the Suit with prejudice and without an award of costs to either Party. Upon Scottsdale's satisfaction of condition 1(a), and while awaiting Scottsdale's satisfaction of condition 1(b), the Parties agree to cooperate in striking pending motions and other pretrial deadlines in the Suit.

The parties further agree to cooperate in drafting a formal settlement agreement generally consistent with the terms of the Mutual Release And Settlement Agreement attached hereto as Exhibit A, but agree that this CR 2A document contains the materials terms of their settlement agreement and expresses their intent to be bound thereby, conditioned upon Scottsdale's satisfaction of the conditions set forth above. The Parties agree to submit any dispute concerning the final terms of that comprehensive agreement to the Honorable Steve Scott, who shall have final authority to result such dispute.

Executed at Seattle, Washington, effective the date specified below.

SUSAN PEDER, as assignee of ALEXANDER
PEDER

6/27/13
Dated

By: _Margaret Boyle_
Its: _Attorney_

51306312.1

6/27/13
_____
Dated

X10 WIRELESS TECHNOLOGY, INC.

By: Michael Rudelyfy
Its: attorney

EXHIBIT F

FOSTER PEPPER PLLC

Direct Phone      (206) 447-2911
Direct Facsimile   (206) 749-1953
bradley.hoff@foster.com

July 28, 2017

**VIA FEDEX**

Mr. Martin J. O'Leary
Mr. Scott M. Bloom
Sedgwick LLP
333 Bush Street, 30th Floor
San Francisco, CA  94104-2834

> Re:   *Peder v. X10 USA, Inc., et al.*, King County Superior Court Case
>         No. 11-2-44104-1KNT
>         Policy No.    EK13036412
>         Claim No.    1207507

Dear Messrs. O'Leary and Bloom:

As you know from our prior correspondence and discussions concerning the above-referenced suit against Scottsdale Indemnity Company's insureds, we represent Susan Peder, the plaintiff in that suit and the assignee of Scottsdale's insured's contractual and extracontractual rights against Scottsdale with respect to that suit.  And now that Judgment (copy attached) has been entered against Scottsdale's insured in that suit, Ms. Peder is also the judgment creditor of Scottsdale's insured.

As you will see, Ms. Peder holds a Judgment in the amount of $550,000 against X10 Wireless Technology, Inc.  This letter demands that Scottsdale satisfy that Judgment by paying Ms. Peder the full stated amount of that Judgment by no later than August 21, 2017.  Payment should be made via check payable to the Foster Pepper PLLC Trust Account, and delivered to the attention of the undersigned at the address set forth below.  Upon receipt of that payment in full, Ms. Peder will file a Satisfaction of Judgment.

As you will recall, Scottsdale previously refused to fund a "subject to funding" settlement between Ms. Peder and Scottsdale's insureds, which was for the same amount as the recently entered Judgment.  If Scottsdale refuses to satisfy the Judgment for that same amount by the date specified above, Ms. Peder will file suit against Scottsdale in her dual capacities as judgment creditor and assignee of the rights of Scottsdale's insured, which will seek to enforce the Judgment against the subject policy issued by Scottsdale, as well as damages available under common law and applicable statutes – e.g., Washington's Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015.  To that end, this letter also encloses the 20-day pre-suit notice required under IFCA.

July 28, 2017
Page 2


I am sending you this letter in your capacity as Scottsdale's counsel and designated representative and correspondent throughout this matter. Please let me know immediately if you contend this letter should also be sent to any other person, department, or address and we will proceed accordingly.

We look forward to hearing from you. In the meantime, please do not hesitate to contact me if you would like to discuss this matter further.

Sincerely,

Bradley W. Hoff

BWH/lgw

Enclosures

cc:  Client (w/encls.)
     Margaret Boyle (w/encls.)



OFFICE of the
**INSURANCE**
**COMMISSIONER**
WASHINGTON STATE

**INSURANCE FAIR CONDUCT ACT**
**20 DAY NOTIFICATION SHEET**

| **Attn:** | **Submitted by:** |
|---|---|
| Office of the Insurance Commissioner<br>Insurance Fair Conduct Act Claim Notification<br>Office Support Unit<br>P.O. Box 40255<br>Olympia, WA 98504-0255 | **Name:** Bradley W. Hoff<br>**Law Office:** Foster Pepper PLLC<br>**Address** 1111 Third Avenue, Suite 3000<br>Seattle, WA 98101<br>**Phone** 206-447-2911<br>**Email** brad.hoff@foster.com<br>**Date** July 28, 2017 |

**If you want to sue your insurance company under the Insurance Fair Conduct Act:**

✓ Complete and submit this 20 day notification sheet stating your intent and its basis to:
- the insurance company, and
- the Office of Insurance Commissioner (OIC) – *no other documents are required to be submitted with your 20 day notice to the OIC. Any additional supporting documents received will not be retained.*

✓ All information provided to the OIC becomes subject to the Public Records Act. Please do not include any personal or confidential information such as medical records/information, social security numbers, banking information, driver's license information, etc. as we do not use it.

✓ Notice may be provided by regular mail, registered mail, or certified mail with return receipt requested. Allow three business days for mailing and an additional 20 days before filing your lawsuit.

**Insurance Company:** Scottsdale Indemnity Company

**First Party Claimant:** Susan Peder

**Line of Insurance:** Liability

**Basis for claim:**

[X] WAC 284-30-330, "Specific Unfair Claims Settlement Practices Defined";

[X] WAC 284-30-350, "Misrepresentation of Policy Provisions";

[ ] WAC 284-30-360, "Failure to Acknowledge Pertinent Communications";

[ ] WAC 284-30-370, "Standards for Prompt Investigation of Claims";

[X] WAC 284-30-380, "Standards for Prompt, Fair and Equitable Settlements Applicable to All Insurers";

[X] An unfair claims settlement practice rule adopted and codified in chapter 284-30 of the Washington Administrative Code by the insurance commissioner intending to implement the Insurer Fair Claims Act; or

[X] RCW 48.30.015 for unreasonably denying a claim for coverage or payment of benefits under the Insurance Fair Conduct Act.

[ ] Other: _____

FILED
17 MAY 15 PM 1:51

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 11-2-44104-1 KNT

HONORABLE BILL BOWMAN

1
2
3
4
5
6

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

7  Susan Peder, as assignee,                  )
8                     Plaintiff,              )        NO.  11-2-44104-1 KNT
9            v.                                )        JUDGMENT
10 X10 USA, Inc., a New Jersey Corporation, and )
   X10 Wireless Technology, Inc., a Delaware   )        **Clerk's Action Required**
11 Corporation,                                )
12                    Defendants.              )

13     On May 10, 2017, this Court granted the stipulated motion by plaintiff, Susan Peder, and

14 defendant, X10 Wireless Technology, Inc., to enter judgment in favor of Peder in the amount of

15 $550,000.

16
17     NOW THEREFORE, JUDGMENT is hereby entered in favor of Peder as follows:

18 1.   Judgment Creditor:                     Susan Peder, as assignee

19 2.   Judgment Debtor:                        X10 Wireless Technology, Inc.

20 3.   Principal Amount:                       $550,000

21 4.   Interest rate to date of judgment:      12 percent

22 5.   Interest rate after judgment:           12 percent

23 6.   Reasonable costs:                       -0-

24
25 7.   Attorney fees:                          included

26 8.   Total judgment:                         $550,000

27

STIPULATED JUDGMENT – 2

BOYLE • MARTIN, PLLC
200 WEST THOMAS, STE. 420
SEATTLE, WASHINGTON 98119
TELEPHONE: 206.217.9400
FACSIMILE: 206.217.9600

| | |
|---|---|
| 1 | 9.  Attorney for judgment creditor:  Margaret Boyle |
| 2 | 10.  Judgment creditor address:  Boyle Martin, PLLC |
| 3 | 200 West Thomas, Ste. 420  Seattle, WA 98119 |
| 4 | 11.  Attorney for judgment debtor:  Richard Hyatt |
| 5 | 12.  Judgment debtor address:  Ryan Swanson & Cleveland PLLC |
| 6 | 1201 3rd Avenue, Ste. 3400  Seattle, WA 98101-3034 |

1  9.   Attorney for judgment creditor:        Margaret Boyle

2  10.  Judgment creditor address:             Boyle Martin, PLLC
3                                              200 West Thomas, Ste. 420
                                               Seattle, WA  98119

4  11.  Attorney for judgment debtor:          Richard Hyatt

5  12.  Judgment debtor address:               Ryan Swanson & Cleveland PLLC
6                                              1201 3rd Avenue, Ste. 3400
                                               Seattle, WA  98101-3034
7
          DONE this _____ day of May, 2017.
8

9

10                                        _____
11                                              JUDGE/COMMISSIONER
                                          KING COUNTY SUPERIOR COURT
12

13
Presented by:
14  BOYLE MARTIN, PLLC

15
     /s/Margaret M. Boyle_____
16  Margaret M. Boyle, WSBA#17089
17  Attorneys for Plaintiff

18

19  RYAN SWANSON & CLEVELAND PLLC

20
     /s/Richard J. Hyatt_____
21  Richard J. Hyatt, WSBA#14048
22  Attorneys for Nancy L. James, as Chapter 7 Trustee
    for X10 Wireless Technology, Inc.
23

24

25

26

27
STIPULATED JUDGMENT – 2                        BOYLE • MARTIN, PLLC
                                               200 WEST THOMAS, STE. 420
                                               SEATTLE, WASHINGTON 98119
                                               TELEPHONE: 206.217.9400
                                               FACSIMILE: 206.217.9600

King County Superior Court
Judicial Electronic Signature Page

Case Number:        11-2-44104-1
Case Title:         PEDER VS X10 USA ET AL

Document Title:     JUDGMENT

Signed by:          John Chun
Date:               5/15/2017 1:51:42 PM

Judge/Commissioner: John Chun

This document is signed in accordance with the provisions in GR 30.
Certificate Hash:          D034240CBFAC8AAF68DEEA303CE62DB356FF1AE3
Certificate effective date: 1/17/2014 3:29:25 PM
Certificate expiry date:   1/17/2019 3:29:25 PM
Certificate Issued by:     C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                           O=KCDJA, CN="John Chun:
                           HN5Vkov44hG5BBZrYYhwmw=="

Page 3 of 3